IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| MARC SPARKS, on behalf of himself and those similarly situated | ) ) ) | Civil Action No. |
| *Plaintiffs* | ) ) ) | |
| v. | ) ) | **COMPLAINT FOR DECLARATORY AND** |
| JANET MILLS, in her official capacity as the Governor of the State of Maine; RANDALL LIBERTY, in his official capacity as the Commissioner of the Department of Corrections; LAURA FORTMAN, in her official capacity as the Commissioner of the Department of Labor | ) ) ) ) ) ) ) ) | **INJUNCTIVE RELIEF** |

## INTRODUCTION

1.  Plaintiff Marc Sparks was, until recently, employed as a grill cook at the Applebee's restaurant in Thomaston, Maine. At Applebee's, Mr. Sparks worked approximately forty-five hours a week, typically on Friday through Tuesday from roughly 4pm until midnight. When he started his job, he made $13 an hour, but he was recently given a raise to $14 an hour. He enjoyed his job, and his manager greatly appreciated his work ethic and dedication.

2.  The COVID-19 pandemic brought Mr. Sparks's employment, along with the employment of thousands of individuals in the state of Maine and across the country, to a halt. Like many Americans, Mr. Sparks is eager to begin working again. He stays in regular contact with his manager, who intends to hire Mr. Sparks back as soon as pandemic restrictions lift.

3.  The only difference between Mr. Sparks and his co-workers at Applebee's is that Mr. Sparks is incarcerated at the Bolduc Correctional Facility ("BCF") in Warren, Maine. While Mr.

1

Sparks's co-workers went home at the end of their shifts, Mr. Sparks and his fellow incarcerated co-workers were transported back to BCF.

4.   Mr. Sparks's employment at Applebee's was facilitated by BCF's Work Release Program. The Work Release Program allows incarcerated individuals classified as "community custody"— the lowest security classification—to work at and receive wages from employers in the local community. Participants in BCF's Work Release Program work at a range of businesses, such as restaurants, landscaping companies, plowing companies, lobster wharves, and sawmills. These employers typically value the work of their incarcerated employees greatly. For instance, Applebee's plans to hire Mr. Sparks permanently once he is released from prison. Almost all of the participants in the Work Release Program work full-time, and many work overtime.

5.   The Maine Department of Corrections withholds roughly ten percent of the income earned by incarcerated people through the Work Release Program to cover the costs of their room, board, and transportation. It also withdraws funds to cover child support and fines owed by individuals in the program—typically up to fifty percent for child support and twenty-five percent for fines. Federal and state income taxes are also deducted from participants' paychecks. After these mandatory withdrawals, Work Release Program participants often have only a small amount of money left to send home to family or to purchase basic goods at the BCF commissary.

6.   On March 16, 2020, as the COVID-19 crisis became seriously recognized, the Work Release Program was brought to a halt in an effort to reduce non-essential contact between incarcerated individuals and the outside world and to reduce the possibility of COVID-19 spreading through Maine's prisons. Mr. Sparks and the other Work Release Program participants were gathered and told that, effective immediately, they no longer would be allowed to work in the community.

7.   In response to the COVID-19 crisis and its devastating impact on the economy, the Maine State Legislature passed emergency legislation easing the requirements for unemployment benefits. *See* P.L. 2020, Ch. 617, Part B-1, codified at 26 M.R.S. § 1199(2)(A).

8.   Within a week of the Work Release Program ending, prison officials at BCF encouraged Mr. Sparks and other individuals who found themselves out of work due to the indefinite suspension of the Work Release Program to apply for these benefits. Mae Worcester, BCF's Community Programs Coordinator, met with the program participants individually to help them file their unemployment applications. Mr. Sparks and the other program participants supplied their accurate, up-to-date information in the course of these applications.

9.   Fifty-three incarcerated individuals were ultimately deemed eligible for unemployment benefits, including the standard state benefit and the federal Pandemic Unemployment Assistance ("PUA") payment, which is currently set to pay $600 per week through the end of July. In total, the fifty-three individuals received $198,767 in unemployment benefits—an average amount of $3,750 per person. Like the wages earned by the Work Release Program participants prior to the COVID-19 pandemic, large portions of these unemployment benefits were deducted by BCF to cover room and board, child support, and fines. Mr. Sparks, like many of the Work Release Program participants, received the minimum unemployment benefit amount available to Maine residents: $172 per week from the state plus the $600 PUA payment, for a total of $772 per week.

10.   On April 29, 2020, the Maine Office of the Attorney General prepared a memorandum directed to Maine Department of Labor Commissioner Laura Fortman explaining why the individuals who had previously performed work under the Work Release Program were eligible for unemployment benefits. The memorandum noted that "Maine's unemployment law, the Employment Security Act, provides unemployment compensation benefits to all workers who

3

provide services unless there is an exception set forth in the law." Letter from Nancy Macirowski, Assistant Attorney General, to Maine Department of Labor Commissioner Laura Fortman, Commissioner (April 29,2020) ("Attorney General Letter") at 1, attached hereto as Exhibit A. It went on to conclude that "[e]mployment of inmates by private employers to perform work outside the prison is not exempted from unemployment coverage." *Id.* at 2. Finally, it noted that under emergency legislation passed in response to the COVID-19 crisis, the incarcerated individuals are eligible for unemployment benefits because they "became unemployed for COVID-related reasons." *Id.* at 2, citing P.L. 2020, Ch. 617, Part B-1, codified at 26 M.R.S. § 1199(2)(A) ("An individual is deemed to have met the eligibility requirements . . . as long as the individual remains able and available to work for, and maintains contact with, the relevant employer, and the individual is . . . [u]nder a temporary medical quarantine or isolation restriction to ensure that the individual has not been affected by the subject condition of the state of emergency and is expected to return to work.").

11. On May 15, 2020, Governor Janet Mills issued a letter to Department of Corrections Commissioner Randall Liberty directing the Commissioner to:

1. Provide to the Maine Department of Labor (DOL) a list of all inmates who have participated in work release and who remain incarcerated but are prevented from engaging in work release due to the COVID-19 crisis, to include their DOB's and SSN's; and

2. Place any and all UI benefits received by such inmates in a separate trust account designated solely for this purpose and not distribute those funds further.

Letter from Janet Mills, Governor, to Maine Department of Corrections Commissioner Randall Liberty (May 15, 2020) ("Governor Mills Letter") at 1, attached hereto as Exhibit B. Governor Mills further noted that she was "likewise directing Maine DOL to withhold distribution of further UI benefits of any kind to these inmates." *Id.* at 2.

12. In her letter, Governor Mills noted that "the Attorney General's Office has determined . . . that this circumstance [of the incarcerated individuals receiving unemployment benefits] is legal under the emergency law passed unanimously by the legislature." *Id.* at 1. Governor Mills made no attempt to refute the Work Release Program Participants' eligibility for unemployment benefits. Rather, she noted only that she found the distribution of unemployment benefits "appalling and to be bad public policy," and that she did "not believe that it was the intent of the Legislature or Congress to allow inmates to receive state or federal benefits, including the $600 weekly PUA payment." *Id.*

13. Governor Mills wrote that unemployment funds should be reserved for Mainers "struggling to pay for basic necessities." *Id.* It is worth noting that this is exactly how Mr. Sparks and the other Work Release Program participants used their benefits. Contrary to what Governor Mills appears to believe, basic necessities also cost money for incarcerated individuals and their struggling Maine families. Mr. Sparks used his benefits primarily to support his children, pay for room and board, and to purchase soap, shampoo, toiletries, clothes, and other personal supplies at the BCF commissary.

14. Pursuant to Governor Mills's directive, Commissioner Fortman and the Department of Labor have halted the distribution of further unemployment benefits to the Work Release Program participants—despite the Attorney General's legal determination that the participants are entitled to those benefits. Additionally, Commissioner Liberty and the Department of Corrections have seized funds from the bank and phone accounts of Work Release Program participants in an effort to recoup the unemployment benefits those individuals received. The unemployment benefits seized from the Work Release Program participants have been placed in a designated trust account.

15. The seizure of funds mandated by Governor Mills has dramatically impacted those incarcerated at BCF who received unemployment benefits. For instance, because Mr. Sparks spent approximately $350 of the money that he received in unemployment benefits, his phone account is now levied each time his girlfriend pays money to the account so that she can speak to Mr. Sparks on the phone. Until the $350 is recouped, Mr. Sparks cannot communicate with the outside world other than through a collect call. Other prisoners face the same issues. For many, the seizure of their funds has deprived them of the simple human acts of talking to their children and loved ones on the phone and purchasing personal care items at the commissary.

16. The cessation of unemployment benefits for the Work Release Program participants and the seizure of benefits already paid occurred without any semblance of procedural due process. Governor Mills acted unilaterally and outside the scope of her executive authority to deprive qualified individuals of the funds to which they are legally entitled. In doing so, she usurped the authority of both the legislature that drafted the emergency unemployment legislation and the judiciary whose role it is to interpret that legislation.

17. In Governor Mills's letter, she noted that the Work Release Program "is a privilege—not a right." Governor Mills's Letter at 1. This may be true. However, under the United States Constitution, procedural due process *is* a right. Fifty-three total individuals, including Mr. Sparks, remain legitimately entitled to the unemployment benefits they have received in the past and to the continued receipt of those benefits under Maine law. When Governor Mills unilaterally demanded the cessation of those benefits and the seizure of the funds previously paid to these individuals, she deprived them of their legitimate property interests without any form of procedural due process. Accordingly, Mr. Sparks brings this action on behalf of himself and the additional

fifty-two Work Release Program participants, who are all similarly situated, to challenge the denial of their constitutional rights.

18. Mr. Sparks brings this action under 42 U.S.C. § 1983 to vindicate his right to procedural due process under the Fourteenth Amendment to the United States Constitution. Mr. Sparks seeks: (1) a declaration that Governor Mills's directives to the Department of Corrections to place all unemployment benefits received by the Plaintiffs into a trust account and to the Department of Labor to cease further distribution of unemployment benefits violated the constitutional guarantee to procedural due process; (2) an injunction mandating Commissioner Liberty and the Department of Corrections to return the unemployment benefits currently held in a designated trust account to the accounts of the appropriate individuals; and (3) an injunction enjoining Commissioner Fortman and the Department of Labor from denying unemployment benefits to individuals who are entitled to those benefits under Maine law.

## JURISDICTION

19. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

## VENUE

20. Venue in the District of Maine is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs' claim occurred in this District.

## PARTIES

21. Plaintiff Marc Sparks is a resident of Hancock County, Maine currently incarcerated in Knox County, Maine.

22. Defendant Janet Mills is the Governor of Maine. She is sued in her official capacity as a state actor for declaratory and injunctive relief only.

23. Defendant Randall Liberty is the Commissioner of the Maine Department of Corrections. He is sued in his official capacity as a state actor for declaratory and injunctive relief only.

24. Defendant Laura Fortman is the Commissioner of the Maine Department of Labor. She is sued in her official capacity as a state actor for declaratory and injunctive relief only.

## FACTS

**A.  The Plaintiffs are entitled to unemployment benefits under Maine state law.**

25. Mr. Sparks and fifty-two others were employed by employers in the local community through BCF's Work Release Program, and they received wages from those community employers until BCF was forced to end the Work Release Program in mid-March of 2020 due to the COVID-19 pandemic.

26. Mr. Sparks and the other Work Release Program participants applied for and received unemployment benefits, including the standard state benefit and the federal PUA payment. In total, the fifty-three individuals received $198,767 in unemployment benefits.

27. The Maine Office of the Attorney General acknowledges that Mr. Sparks and the other Work Release Program participants were and remain legally entitled to receive unemployment benefits. In its April 29, 2020 Memorandum, the Office of the Attorney General explained:

> Maine's unemployment law, the Employment Security Act, provides unemployment compensation benefits to all workers who provide services unless there is an exception set forth in the law. The exception for inmates of prisons does not apply to work release. That section applies to:

> [s]ervice performed in the employ of any organization that is excluded from the term "employment" as defined in the Federal Unemployment Tax Act solely by reason of 26 United States Code,

8

Section 3306(c)(7) or (8) if . . .(g) Service is performed by an inmate
of a custodial or penal institution.

26 M.R.S. § 1043(11)(F)(17)(g).

The sections of the Federal Unemployment Tax Act that are references, 26 U.S.C.
§ 3306(c)(7) and (8), apply to unemployment by the state and political subdivisions and
employment by religious and other organizations organized under 501c3 of the Tax Code.
Thus, the exception applies only to inmates who perform services for the state and political
subdivisions (including prisons) or for certain nonprofit organizations. Employment of
inmates by private employers to perform work outside the prison is not exempted from
unemployment coverage. In the absence of an applicable exemption, prisoners are workers
eligible for unemployment benefits.

The prisoners became unemployed for COVID-related reasons. It is my
understanding that prison officials made the determination to prohibit prisoners from
performing work release because of concerns of COVID, thus quarantining the prisoners.
It is the expectation that these prisoners will return to their work release jobs when
quarantine is lifted. Thus, the prisoners are eligible for unemployment benefits pursuant to
the emergency legislation, P.L. 2020, Ch. 617, Part B-1, codified at 26 M.R.S. §
1199(2[)](A):

> 2. Eligibility. An individual is deemed to have met the eligibility
> requirements under section 1192, subsection 2 and 3 as long as the
> individual remains able and available to work for, and maintains
> contact with, the relevant employer and the individual is:
>
> A. Under a temporary medical quarantine or isolation restriction to
> ensure that the individual has not been affected by the subject
> condition of the state of emergency and is expected to return to
> work.

Attorney General Letter at 1-2.

**B. Governor Mills, acting under color of law, made an extra-procedural decision to deny
the Plaintiffs the unemployment benefits to which they are entitled and seize to the
benefits already paid to them.**

28. On May 15, 2020, Governor Mills sent Department of Corrections Commissioner Randall

Liberty a letter written on official letterhead demanding him to:

1. Provide to the Maine Department of Labor (DOL) a list of all inmates who have
   participated in work release and who remain incarcerated but are prevented from
   engaging in work release due to the COVID-19 crisis, to include their DOB's and
   SSN's; and

2.  Place any and all UI benefits received by such inmates in a separate trust account designated solely for this purpose and not distribute those funds further.

Governor Mills Letter at 1.

29. Governor Mills also noted that she had "direct[ed] Maine DOL to withhold distribution of further UI benefits of any kind to these inmates." *Id.* at 2.

30. Governor Mills did not provide any legal response to the determination by her own Attorney General that Mr. Sparks and the other Work Release Program participants were entitled to unemployment benefits. Rather, she simply noted that she found the legislation to be "appalling and to be bad public policy." *Id.* at 1. She went on to interpret the intent of the federal and state legislatures, arguing that they could not have intended to allow incarcerated individuals to receive unemployment benefits. *Id.* Finally, she opined that "[w]hile work release offers inmates a valuable opportunity to learn life skills, support local employers, and earn a salary that can be used to pay restitution to victims, it is a privilege—not a right—and any inmate who loses that privilege for whatever reason should not have access to our limited public benefit system." *Id.*

31. Pursuant to Governor Mills's directive, Laura Fortman, Commissioner of the Department of Labor, halted the distribution of further unemployment benefits to Mr. Sparks and the other Work Release Program participants.

32. Also pursuant to Governor Mills's directive, Randall Liberty, the Commissioner of the Department of Corrections, seized funds in the bank accounts of Mr. Sparks and the other Work Release Program Participants and placed them in a designated trust. In an effort to recoup the unemployment benefits paid to Mr. Sparks and the other Work Release Program participants, funds placed into phone and bank accounts by the participants' families were also seized and placed in the trust. As families place more money into these accounts, those funds continue to be seized.

10

33. Governor Mills's directive was not based on any legal authority. The Constitution of the State of Maine grants the Governor, as the chief executive, the right to enforce the laws of the state. ME. CONST. art. V, § 12. However, only the judicial branch can interpret the law and only the legislative branch can amend it. This separation of powers is the bedrock of American democracy.

34. Because Governor Mills's directive is entirely outside the scope of due process, Mr. Sparks and the other Work Release Program participants had no administrative recourse by which they could challenge or appeal the cessation of their benefits and the seizure of benefits already paid. Mr. Sparks and the other Work Release Program Participants were provided no opportunity for a hearing to determine their eligibility for unemployment benefits. They were provided no actual notice that their unemployment benefits were to be terminated and their bank and phone accounts levied. There was no change in the law or to any rules that would have even given Mr. Sparks and the other Work Release Program participants constructive notice that they had been deemed ineligible for unemployment benefits. The benefits were simply halted, and the benefits already paid clawed back, at the direction of a state governor who—motivated by personal conviction or political considerations—felt that fifty-three of Maine's most destitute and powerless residents should not receive unemployment benefits when a pandemic forced them from their jobs.

## CLASS ALLEGATIONS

35. Mr. Sparks seeks class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(2)-(3). This Class is defined as: "All currently and formerly incarcerated individuals in the State of Maine who were deemed eligible for state and federal unemployment benefits after the loss of their Work Release Program employment and whose benefits ceased pursuant to Governor Mills's May 15, 2020 directive" (the "Class").

36. A class action is the only practicable means by which Mr. Sparks and the Class can challenge the constitutionality of Governor Mills's May 15, 2020 directive and the subsequent seizure of funds by Commissioner Liberty and cessation of benefits by Commissioner Fortman.

37. As set forth below, this action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a). It also meets Federal Rule of Civil Procedure 23(b)(2)-(3).

38. ***Numerosity***: Based on reports to the media, it appears that fifty-three currently and formerly incarcerated individuals received unemployment benefits after the loss of their Work Release Program employment which cease following Governor Mills's May 15, 2020 directive. *See* Nick Sambides Jr., *Inmates got nearly $200K in coronavirus unemployment benefits*, BANGOR DAILY NEWS (May 20, 2020), https://bangordailynews.com/2020/05/20/news/state/inmates-got-nearly-200k-in-coronavirus-unemployment-benefits/; Stephen Betts, *State prison inmates were paid nearly $200,000 in unemployment benefits*, PORTLAND PRESS HERALD (May 20, 2020), https://www.pressherald.com/2020/05/20/state-prison-inmates-were-paid-nearly-200000-in-unemployment-benefits/.

39. Some of these individuals remain incarcerated, while roughly twenty have since been released into the community. Accordingly, a portion of the Class is likely spread throughout the state and beyond, making them difficult to track down and contact.

40. Even the portion of the Class that remains incarcerated is impractically difficult to contact in its entirety. Communication with incarcerated individuals has always been difficult, and this is even more true now that COVID-19 has made attorney visits difficult or impossible. As of this filing, BCF is in lockdown due to COVID-19. Phone and email communication with incarcerated individuals remains challenging, particularly when many of the individuals in the Class have had

their phone accounts levied to pay back their unemployment benefits. Representation of each incarcerated person individually would be essentially impossible.

41. Members of the Class are typically low-income individuals who lack the financial resources to bring an independent action or to be joined in this action. By the Class's very nature, it is made up of unemployed incarcerated individuals. It is reasonable to assume that these individuals would be unable to afford counsel to bring their own separate action against the Defendants. Moreover, with an average unemployment claim of $3,750 per person, even if an individual member of the Class could afford private counsel, he would be unlikely to do so when the cost would be many times the amount of his individual claims.

42. ***Commonality***: All individuals in the Class were equally subject to the loss of their unemployment benefits and the seizure of the previously received funds from their accounts as a result of Governor Mills's May 15, 2020 directive. Accordingly, Mr. Sparks raises his claim based on questions of law and fact that are common to, and typical of, the Class he seeks to represent. Common questions of fact include:

     a. Whether the Class is entitled to unemployment benefits under Maine Law; and

     b. Whether, as a result of Governor Mills's May 15, 2020 directive, Commissioner Liberty and the Department of Corrections seized funds in the bank and phone accounts of the Class members in order to compensate for the unemployment benefits which they had received; and

     c. Whether, as a result of Governor Mills's May 15, 2020 directive, Commissioner Fortman and the Department of Labor withheld future distribution of unemployment benefits to the Class members.

43. Common questions of law include:

a.  Whether Governor Mills's May 15, 2020 directive and the subsequent actions by Commissioner Liberty and Commissioner Fortman violated the Fourteenth Amendment Procedural Due Process Clause by depriving the Class of a legitimate property interest with no procedural safeguards.

b.  Whether injunctive and declaratory relief is appropriate and, if so, what the terms of such relief should be.

44. The relief sought for the Class is common among all members of the Class. Mr. Sparks seeks relief declaring Governor Mills's directive and the subsequent actions by Commissioners Liberty and Fortman unconstitutional. He additionally seeks an injunction mandating Commissioner Liberty to return the unemployment benefits currently held in a designated trust account to the accounts of the appropriate individuals; as well as an injunction enjoining the Commissioner Fortman from denying unemployment benefits to individuals who are entitled to those benefits under Maine law.

45. *Typicality*: The claims of Mr. Sparks are typical of the claims of the Class as a whole. Mr. Sparks and the rest of the Class have suffered the same loss of their legitimate property interest in their unemployment benefits, and they will continue to suffer that loss until Governor Mills's directive and the subsequent actions by Commissioners Liberty and Fortman are declared unconstitutional, Commissioner Liberty is enjoined to return the unemployment benefits currently held in a designated trust account to the accounts of the appropriate individuals, and Commissioner Fortman is enjoined from denying unemployment benefits to individuals who are entitled to those benefits under Maine law.

46. Because Mr. Sparks and the Class all challenge the same unlawful actions, Governor Mills and Commissioners Liberty and Fortman will likely assert similar defenses against Mr. Sparks and

the rest of the Class. Moreover, the answer to whether the statute is unconstitutional will determine the success of the claims of Mr. Sparks as well as ever other member of the Class. If Mr. Sparks is successful in his claim that the actions of Governor Mills and Commissioners Liberty and Fortman violated his constitutional rights, that ruling will benefit every other member of the Class.

47. ***Adequacy***: Mr. Sparks will fairly and adequately represent the interests of the Class he seeks to represent.

48. Mr. Sparks has no interest seperate from, or in conflict with, those of the Class he seeks to represent, and he seeks no relief other than the declaratory and injunctive relief sought on behalf of the entire proposed class.

49. ***Rule 23(b)(2):*** Class action status under Rule 23(b)(2) is appropriate because Governor Mills and Commissioners Liberty and Fortman have acted or failed and/or refused to act on grounds that generally apply to this proposed Class, such that final injunctive and declaratory relief is appropriate and necessary with respect to each member of the Class. Specifically, the Governor Mills's directive and the actions of Commissioners Liberty and Fortman deprived all members of the Class of their legitimate property interest in their unemployment benefits in violation of the Due Process Clause of the Fourteenth Amendment.

50. Accordingly, a declaration that Governor Mills's directive and the subsequent actions of Commissioners Liberty and Fortman are unconstitutional, an injunction mandating that Commissioner Liberty return the unemployment benefits currently held in a designated trust account to the accounts of the appropriate individuals, and an injunction and enjoining Commissioner Fortman from denying unemployment benefits to individuals who are entitled to those benefits under Maine law is the only appropriate means of vindicating the rights of each member of the Class.

51. ***Rule 23(b)(3):*** Furthermore, class action status under Rule 23(b)(3) is appropriate because questions of law and fact predominate over questions effecting individuals and are superior to other available methods of adjudication.

52. Specifically, the constitutionality of Governor Mills's directive and the subsequent actions of Commissioners Liberty and Fortman is the predominating issue in this matter. The circumstances of the individual Class members' receipt and denial of benefits are not relevant to this overarching questions. The individual class members have nothing to gain from pursing this claim individually; on the contrary, concentration of this litigation in one forum will only benefit the incarcerated and under-privileged members of this class who likely cannot afford individual counsel. No individuals in the Class have begun any litigation concerning this matter. There will likely be minimal difficulties in managing this class action; on the contrary, this matter is likely to be far more efficient as a class action than it would be as fifty-three individual cases.

53. ***Rule 23(g)***: Mr. Sparks respectfully requests that the undersigned be appointed as Class Counsel. Undersigned counsel, who is the senior partner at Camden Law, LLP, has been in full-time practice since 1996 and has extensive experience in complex civil and criminal litigation. Approximately half of this class of inmates has, individually and through third parties, requested that undersigned counsel represent their interests in this action.  In addition to already having the trust of these inmates, undersigned counsel has experience defending the rights of inmates and criminal defendants through his work as a criminal defense attorney in state court and in federal court as a CJA panel attorney. Undersigned counsel has sufficient resources to prosecute these claims on behalf of the Class, including other experienced litigation attorneys and several paralegals and law students working within the firm.

## COUNT ONE
### Fourteenth Amendment of the United States Constitution
### (Violation of Procedural Due Process)

54. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the proceeding paragraphs as if fully set forth here.

55. Mr. Sparks asserts this claim on behalf of himself and the proposed Class he seeks to represent.

56. The Fourteenth Amendment of the United States Constitution prohibits the State of Maine from depriving any person of life, liberty, or property without due process of law.

57. The cornerstone of due process when a property interest is at stake is notice and a meaningful opportunity to be heard in a meaningful time and a meaningful manner.

58. Notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action; to accurately describe legal rights and options available to the parties; and to afford them an opportunity to present their objections.

59. Mr. Sparks and the proposed Class have a property interest in the unemployment benefits to which they are entitled under Maine law.

60. Governor Mills's May 15, 2020 directive and the subsequent actions of Commissioners Liberty and Frontman deprived Mr. Sparks and the Class of the unemployment benefits to which they are entitled under Maine law.

61. Mr. Sparks and the Class were afforded no meaningful opportunity to be heard regarding the deprivation of the unemployment benefits in which they have a legitimate property interest.

62. Mr. Sparks and the Class received no notice apprising them of the pendency of the deprivation of their unemployment; describing their legal rights and options; or affording them an opportunity to present their objections.

63. The exists no lawful reason for depriving Mr. Sparks and the Class of the unemployment benefits to which they are entitled under Maine Law.

64. Governor Mills acted outside her authority to unilaterally impose her own belief that it was "appalling" that certain individuals who worked in the community lawfully received unemployment benefits when their work was curtailed due to a global pandemic.

65. The state and federal governments included no such value judgments in the laws mandating unemployment and COVID-19 relief. There is therefore no legitimate governmental interest that justifies the deprivation of unemployment benefits from Mr. Sparks and the Class.

66. Governor Mills's May 15, 2020 directive and the subsequent actions of Commissioners Liberty and Fortman violate the Procedural Due Process Clause of the Fourteenth Amendment of the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

a.  Assume jurisdiction over this action;

b.  Certify a Class under Rules 23(a) and (b)(2)—(3) of the Federal Rules of Civil Procedure, represented by Mr. Sparks, related to Count One.

c.  Issue a declaration that Governor Mills's directive to the Department of Corrections and the Department of Labor to place all unemployment benefits received by the Plaintiffs into a trust account and to cease further distribution of unemployment benefits—and the subsequent actions by the commissioners of those departments acting on Governor Mills's directive—are unconstitutional;

d.  Enter an injunction mandating Commissioner Liberty and the Department of Corrections to return the unemployment benefits currently held in a designated trust account to the accounts of the appropriate individuals;

e.  Issue an injunction enjoining Commissioner Fortman and the Department of Labor from denying unemployment benefits to individuals who are entitled to those benefits under Maine law.

f.  Award prevailing party costs, including attorney fees per 42 U.S.C. § 1988(b); and

g.  Grant such other relief as the Court deems just and appropriate.

Dated June 2, 2020.                                    Respectfully submitted,

/s/ Christopher K. MacLean, Esq.
Christopher K. MacLean, Esq.
CAMDEN LAW, LLP
20 Mechanic Street
Camden, Maine 04843
207-236-8836
Maine Bar No. 8350
chris@camdenlaw.com