UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| MARC SPARKS, on behalf of himself and those similarly situated, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) No. 2:20-cv-190-LEW |
| JANET MILLS, et al., | ) ) ) |
| Defendants, | ) ) |

**ORDER ON DEFENDANTS' MOTION TO DISMISS**
**FIRST AMENDED COMPLAINT**

In this action Marc Sparks ("Plaintiff"), on behalf of himself and those similarly situated, alleges that Janet Mills, the Governor of Maine, Randall Liberty, the Commissioner of the Department of Corrections, and Laura Fortman, the Commissioner of the Department of Labor (collectively, "Defendants") improperly seized already realized and improperly denied future unemployment benefits. In his First Amended Complaint (ECF No. 10), Plaintiff asserts a solitary claim alleging a deprivation of procedural due process in violation of the Fourteenth Amendment.

Defendants seek to dismiss Plaintiff's complaint for two reasons. First, Defendants believe this Court should abstain so the State of Maine can hash out the novel issues of state law at the heart of this case without federal interference. Secondly, Defendants argue that Plaintiff has failed to state a claim upon which relief may be granted. Finally, Defendants argue they are not subject to Plaintiff's suit to the extent there is a claim for

money damages because they are immune under the qualified immunity doctrine. For the following reasons, Defendants' Motion to Dismiss (ECF No. 14) is GRANTED.

## BACKGROUND

While incarcerated at Bolduc Correctional Facility, Plaintiff participated in the Work Release Program ("WRP") which permitted certain inmates to work outside the facility to earn money and ease their transition back into society. Plaintiff typically worked about forty-five hours per week at Applebee's in Thomaston, Maine. However, on March 16, 2020, the State of Maine suspended the WRP and told participants they could no longer leave the facility to limit their potential exposure to COVID-19.

In response to the pandemic, the Maine Legislature passed emergency legislation easing the requirements for unemployment benefits. *See* P.L. 2020, Ch. 617, Part B-1, codified at 26 M.R.S. § 1199(2)(A). Shortly after its passage, Mae Worcester, Bolduc's Community Programs Coordinator, encouraged WRP participants to apply for benefits and helped them file their applications. On April 29, 2020, an Assistant Attorney General ("AAG') sent Department of Labor ("DOL") Commissioner Laura Fortman a memo explaining why she believed that WRP participants were eligible for unemployment benefits. Based, at least in part, on this memo, the DOL determined that WRP participants were eligible under the new legislation. Fifty-three WRP participants were deemed eligible for both state and federal unemployment benefits. In total, these individuals received $198,767. Plaintiff personally received seven payments of $106 from the state of Maine and $600 from the federal government.

After getting wind of the DOL decision, Governor Mills directed DOC Commissioner Randall Liberty to take all unemployment benefits already given to WRP participants and place them into a trust account. Governor Mills also instructed the DOL to withhold any further distribution of unemployment funds to WRP participants because she did not believe either the Maine Legislature or Congress intended to provide WRP participants with unemployment benefits. The DOL and DOC complied with Governor Mills' directives.

## DISCUSSION

Defendants contend that the feds ought to mind their own business, refrain from exercising federal jurisdiction and yield to state courts to resolve this local controversy under the so-called *Burford* abstention doctrine.

A.   **ABSTENTION**

*Burford* abstention is a judicial construct in which a federal court may, in certain circumstances, decline from hearing a case otherwise properly before it.

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (internal quotations omitted). While *Burford* could be interpreted broadly to "requir[e] that federal courts abstain from hearing any case involving important state regulatory policies,"

3

the First Circuit has declined to give the doctrine such a wide reach. *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 30 (1st Cir. 2011).

It is useful in thinking about abstention to recall its limiting principle; that "federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred." *New Orleans Pub. Serv.*, 491 U.S. at 358. Federal courts have "no more right to decline the exercise of jurisdiction, which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution." *Id.* (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821)). "Treason to the Constitution" is suitably strong language. When a plaintiff enters the courthouse doors seeking redress, federal courts "cannot abdicate their authority or duty in any case [to which their jurisdiction extends] in favor of another jurisdiction." *Id.* (quoting *Chicot County v. Sherwood*, 148 U.S. 529, 534 (1893)).

While the federal courts' obligation to adjudicate claims within their jurisdiction is not absolute, the obligation is "virtually unflagging." *Id.* at 359 (quoting *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988)). Because abstention "runs so firmly against the jurisprudential grain," *Chico Serv.* Station, 633 F.3d at 29, the carefully defined areas in which a federal court may abstain remain "the exception, not the rule." *New Orleans Pub. Serv.*, 491 U.S. at 358.

*Burford* abstention aims to protect complex state administrative processes from undue federal interference, not all federal interference. *Id.* at 362. *Burford* does not require abstention whenever there is an administrative process or even when there is potential for conflict with regulatory policy. *Id*. The First Circuit has made clear that *Burford* only applies in the "'unusual circumstances,' when federal review risks having the district court

4

become the 'regulatory decision-making center.'" *Chico Serv. Station,* 633 F.3d at 30 (quoting *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 473 (1st Cir. 2009)). Federal courts are not required to abstain "merely because the federal action may impair operation of a state administrative scheme or overturn state policy." *Id. See also Zablocki v. Redhail*, 434 U.S. 374, 380, n. 5 (1978) **(**"[T]here is . . . no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.").

This is not to say that abstention is never appropriate. The Supreme Court instructs that federal courts "have the power to refrain from hearing cases . . . in which the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716-17 (1996). When federal courts abstain, they do so out of "deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism." *Id.* at 723. For those keeping score, on one side of the ledger is the federal judiciary's constitutional duty to hear the cases over which they have jurisdiction and on the other are the principles of comity and federalism. *See id*. at 728.

In *Burford,* the Supreme Court addressed whether the district court should have declined jurisdiction over an oil company's challenge to the Texas Railroad Commission's order allowing Burford to drill four wells in the East Texas oil field. The Court described the regulatory system formulated to govern the conservation of oil and gas in the East Texas oil field "as thorny a problem as has challenged the ingenuity and wisdom of legislatures." *Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) (quoting *Railroad Commission v. Rowan*

5

*& Nichols Oil Co.*, 310 U.S. 573, 579 (1940)). The Texas Legislature had conferred limited jurisdiction over oil field controversies to certain courts because it wanted such controversies to be heard by the same judges so they could, in turn, gain specialized knowledge of this specialized, local problem. When describing the relationship between the state courts and the Commission, the Court called the two "working partners . . . in the business of creating a regulatory system for the oil industry." *Id.* at 326.

*Burford* abstention would require me to conclude that: (1) there exists a timely and adequate state review process that culminates in state-court review; and either 2) the resolution of Plaintiff's federal case would require that I usurp the role of state agencies to establish state policy of substantial public import; or 3) there is no practical means by which I might avoid becoming such a usurper by careful management of the federal case. *Chico Serv. Station*, 633 F.3d at 32.

### 1. Timely and Adequate State Review

The first concern is whether timely and adequate review is available in a state proceeding that will culminate in state-court review. "Under Maine law, a party to an administrative proceeding may appeal any final agency action to a state Superior Court, which will review the decision for abuse of discretion, errors of law, or findings not supported by the evidence." *Kilroy v. Mayhew*, 841 F. Supp. 2d 414, 421 (D. Me. 2012). This Court has held that Maine's general framework for administrative appeals is enough under *Burford. See id.* Although there have been some delays for Sparks, Maine's administrative and state-court review process is available to him and others similarly situated to him.

6

### 2. Difficult Questions of State Law of Substantial Public Import

The "animating concern under *Burford*," *Chico*, 633 F.3d at 32, is that federal courts should not "usurp the role of state administrative agencies in deciding issues of state law and policy." *Id*. Defendants believe a state law conflict is at the heart of this action. This is a tautology and while true insofar as it goes, it is incomplete. A state law conflict standing alone is not enough to carry this element of *Burford*. They contend that Plaintiff is not asking this Court to decide a constitutional question about the adequacy of post-deprivation process, but instead to review a state law unemployment determination made pursuant to a state statute, which invariably would make me the "regulatory decision-making center" unless I abstain.

Defendants unnecessarily frame the constitutional issue as contingent on my deciding the underlying benefits determination by the DOL. However, I do not have to take such a circuitous path on my way to the constitutional destination; nor should I from a jurisprudential standpoint. The State of Maine seized property from the Plaintiff and then offered him post-deprivation process to resolve the dispute, which is sometimes enough to satisfy due process. I see no reason why I cannot address that question without usurping the role of state administrative agencies to formulate policy to govern the novel unemployment benefits scenario at the heart of the underlying dispute. Accordingly, Defendants have not convinced me this prong of *Burford* is satisfied.

### 3. Ability to Avoid Disruption of State Policy Development

The final consideration is whether federal review of the case can be managed in a way that avoids disruption of state efforts to establish a coherent policy. Defendants argue that federal adjudication poses a grave risk to Maine's coherent administration of its unemployment insurance system. Along the same lines as I have previously discussed, I disagree. Determining who is eligible for unemployment benefits is no doubt of paramount concern to the State and to the public, but there is nothing particularly unique about these determinations that would make federal review of due process concerns disruptive to Maine. Although the underlying question here is one of first impression in Maine, and Defendants believe that question "rests on multiple difficult questions of statutory interpretation," they have not satisfied me that this is 1) true considering the narrow path to a constitutional conclusion; and 2) comparable to the legislative and administrative scheme in *Burford.* As we recall, the scheme in *Burford* was described "as thorny a problem as has challenged the ingenuity and wisdom of legislatures." *Burford*, 319 U.S. at 318. Review of eligibility determinations under Maine's unemployment statutes cannot be described in the same way. There is nothing particularly vexing about the way Maine reviews eligibility determinations that renders state courts better equipped to adjudicate due process concerns arising out of the implementation of the regulatory scheme. And for reasons that will be apparent, I do not have to reach deep into the weeds of Maine's statutory scheme to resolve the constitutional issue.

I am not convinced that the risk of intruding on the state system outweighs the potential detriment to the Plaintiff's Due Process rights under the Constitution or that I cannot manage these proceedings to avoid the sort of intrusion that could fairly be

considered usurpation of the administrative function. Therefore, *Burford* abstention does not prevent me from adjudicating this case on its merits.

B.     FAILURE TO STATE A CLAIM

Defendants believe that Plaintiff did not have a constitutionally protected interest in his unemployment benefits, but even if he did, he was afforded all the process he was due. A challenge under Rule 12(b)(6) tests the facts to insure they "contain enough meat to support a reasonable expectation that an actionable claim may exist." *Andrew Robinson Int'l v. Hartford Fire Ins. Co.*, 547 F.3d 48, 51 (1st Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). In evaluating a Rule 12(b)(6) motion, courts apply a two-pronged test. First, I screen the complaint for statements that "merely offer 'legal conclusions couched as fact' or 'threadbare recitals of the elements of a cause of action.'" *Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (citations omitted). Second, I determine whether the factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. If "the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc) (citing *Twombly*, 550 U.S. at 555).

The Due Process Clause of the Fifth Amendment prohibits the government from depriving any person of property without "due process of law." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002). This means that the "threshold issue in a procedural due process action is whether the plaintiff had a constitutionally protected property interest at stake."

*Clukey v. Town of Camden*, 717 F.3d 52, 55 (1st Cir. 2013). In addition to protecting physical property, the Due Process Clause "guarantees individuals procedural protections from state actions that deprive those individuals of their property interests in certain entitlements and benefits." *Id.*

When a person's property interests are at stake, they are entitled to notice and an opportunity to be heard. *Dusenbery*, 534 U.S. at 167 (quoting *United States v. James Daniel Good Real Property*, 510 U.S. 43, 48 (1993)). In analyzing due process claims, I analyze three factors: "(1) the private interest that will be affected by the official action, (2) a cost-benefit analysis of the risks of an erroneous deprivation versus the probable value of additional safeguards, and (3) the Government's interest, including the function involved and any fiscal and administrative burdens with using different procedural safeguards." *Id.*

I turn first to the threshold question of whether Plaintiff had a constitutionally protected property right in unemployment benefits. The First Circuit has not expressly answered this question,[1] and I do not need to answer it to decide the merits of this case. I will assume, without deciding, that unemployment benefits, like welfare benefits, ". . . are a matter of statutory entitlement for persons qualified to receive them," *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970), and, therefore are granted procedural due process protection and move to the heart of the controversy before me - whether the process afforded Plaintiff is the process due him under the Constitution.

---

[1] Other Circuits have decided that unemployment benefits are afforded due process protection. *See Ross v. Horn*, 598 F.2d 1312, 1317 (3rd Cir. 1979); *Robbins v. United States Railroad Retirement Bd.*, 586 F.2d 1034 (5th Cir. 1978); *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 902–03 (6th Cir. 2019); *Berg v. Shearer*, 755 F.2d 1343, 1345 (8th Cir. 1985).

Because due process is "not a technical conception with a fixed content unrelated to time, place and circumstances[]" *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961), I look to the aforementioned three-factor test to determine the process due in this case. *Mathews v. Eldridge*, 424 U.S. 319.

Receiving unemployment benefits is a significant interest particularly during a global pandemic. When discussing welfare benefits in *Goldberg v. Kelly*, the Supreme Court determined that a pre-termination hearing was required before the government could cease paying an individual welfare benefit. 397 U.S. 254. Defendants argue that welfare benefits and unemployment benefits are inherently different things and, therefore, call for inherently different process. For support, Defendants point to the Supreme Court's guidance that "welfare assistance is given to persons on the very margin of subsistence . . . [such that] 'termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits.' Eligibility for disability benefits, in contrast, is not based upon financial need." *Mathews*, 424 U.S. at 340-41.

While I disagree generally that disability or unemployment benefits are not rooted in financial need like welfare benefits, a foundational examination of the Supreme Court's reasoning is necessary in deciding this case. The Supreme Court focused on the fact that when an individual is at risk of becoming destitute at the cessation of benefits, only a pre-termination hearing will satisfy due process. *Goldberg*, 397 U.S. at 264. When a constitutionally protected property right "provides the means to obtain essential food, clothing, housing, and medical care[]" only a pre-termination hearing satisfies due process.

*Goldberg*, 397 U.S. at 264. From a constitutional perspective, it would be unacceptable for the government to cut off an individual's means of sustaining life while they attempt to dispute the government's deprivation of a constitutionally protected interest. However, that is not the reality here. The state government provides prisoners with the essentials necessary to sustain life. Because Plaintiff is not at risk of losing the ability to sustain life while appealing the state government's decision in a post-deprivation hearing, that is all the process that is due under the Constitution.

The risk of erroneous deprivation through the post-deprivation proceedings is negligible. The administrative procedures involved here provide the Plaintiff notice and the opportunity to be heard in an adjudicatory proceeding in which they can present evidence, argue all issues, to call and examine witnesses, and to cross-examine any adverse witness. *See* 5 M.R.S. §§ 9051 *et seq*. Plaintiff has the right to appeal to the Maine Unemployment Insurance Commission. 26 M.R.S. § 1194(3) & (5). Plaintiff also has the additional right to appeal that decision to the Maine Superior Court and to appeal yet again to the Maine Supreme Judicial Court. *See* Me. R. Civ. P. 80(C); 26 M.R.S. § 1194(8); 5 M.R.S. § 11008.

Plaintiff's contention that any administrative proceeding in front of the DOL would be a "sham" in light of Governor Mills' position that prisoners were not eligible for unemployment benefits is unnecessarily cynical as any agency errors may be presented to the trial and appellate courts of Maine's separate and independent judicial branch.

The final element is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural

requirement would entail." *Mathews*, 424 U.S. at 335. "The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Id.* at 348. The State of Maine's interest in preserving scarce financial resources during a global pandemic is significant. "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Id.* The burden to the state of providing pre-deprivation process while continuing to pay benefits during a global health crisis is more than is constitutionally required given the governmental interest at issue.

The post-deprivation process afforded to Plaintiff satisfies due process.

### C.  QUALIFIED IMMUNITY

Plaintiff's Amended Complaint plainly states in its opening paragraph that Defendants are sued solely in their official capacity for non-monetary relief. Defendants' assertion of qualified immunity is moot given this statement.

## CONCLUSION

The Defendants' Motion to Dismiss (ECF No. 14) is GRANTED and the First Amended Complaint (ECF No. 10) is DISMISSED.

**SO ORDERED.**

Dated this 26th day of March, 2021.

/s/ Lance E. Walker<br>
UNITED STATES DISTRICT JUDGE